IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION                    PLAINTIFF

vs.                                        CIVIL ACTION NO. 3:17-cv-336-CWR-FKB

ASURION, LLC                                                DEFENDANT

---

## ASURION LLC'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

---

### INTRODUCTION

In April 2015, Lakisha Person ("Person"), along with over 300 other applicants, applied for a Customer Care Representative ("CCR") position at a call center in Meridian, Mississippi that was owned and operated by Defendant Asurion, LLC ("Asurion" or "Defendant"). The CCR position was a technical customer service position that required recent customer service experience and strong communication skills to deescalate customers and troubleshoot their tech issues. Although only 64 of the over 300 applicants were hired, Plaintiff Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") filed this disability discrimination failure-to-hire case claiming Person's application did not proceed past Step 2 (the phone screen) of Asurion's five-step hiring process because she is paralyzed and uses a wheelchair.

The EEOC's claim fails because it cannot establish a prima facie case of discrimination under the Americans with Disabilities Act ("ADA"). Person was not qualified for the CCR position because she did not have recent customer service experience (her reported experience was 8 years prior to the date of her application), she did not demonstrate strong verbal communication skills, and the EEOC is judicially estopped from arguing Person is a qualified individual with a disability because she receives social security disability benefits for a

1

permanent disability. In addition, nondisabled applicants who were similarly situated were not treated more favorably than Person. Even assuming Plaintiff could establish a prima facie case of disability discrimination, Asurion has legitimate, nondiscriminatory reasons for its decision. Not only did Person fail to satisfy the requirements for the CCR position, but Asurion appropriately chose the better qualified applicants and has unfettered discretion to choose among equally qualified applicants. Finally, the EEOC cannot prove pretext.

Person's alleged disability had absolutely nothing to do with any employment related decision. Indeed, Asurion hired employees at the call center who used a wheelchair. Under such circumstances, the EEOC's Complaint should be dismissed, with prejudice. Asurion's Motion for Summary Judgment should be granted in its entirety.

## UNDISPUTED FACTS

### I. Asurion, LLC.

Asurion provides mobile protection insurance and technology warranty support services for smartphones, tablets, consumer electronics, appliances, and satellite receivers. Asurion is an equal opportunity employer and does "not discriminate against applicants or employees on the basis of . . . physical or mental disability." (Exhibit 1, EEO Policy) This "applies to all policies and procedures relating to recruiting and hiring . . . ." (*Id.*) Asurion also has a policy to "make reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant." (Exhibit 2, Reasonable Accommodation Policy) Recruiters and recruiting coordinators who make hiring decisions receive annual training on the handbook and Asurion's nondiscrimination, anti-harassment, and reasonable accommodations policies. (Exhibit 3, 30(b)(6) Dep. at 49:3-50:17, 51:14-52:9)

## II.    Asurion's Customer Care Representative Position.

In 2015, Asurion owned and operated a call center in Meridian, Mississippi (the "call center") where it employed Customer Care Representatives ("CCRs").[1]  (Exhibit 4, Asurion's Resp. to Interrog. No. 14) CCRs handled inbound phone calls from retail customers seeking technical support for escalated tech issues.  (Asurion's Resp. to Interrog. No. 3; *see also* Exhibit 5, CCR Descriptions)  During the calls, CCRs identified customer issues, provided step-by-step instruction to the customer in order to troubleshoot and resolve technical issues, answered customer questions, offered products to customers as appropriate, defused customer frustrations, and resolved customer issues.  (Ex. 4, Resp. to Interrog. No. 3; *see also* Ex. 5)  It was not an entry-level position.  (30(b)(6) Dep. 37:7-38:12; Exhibit 6, Gillow Dep. 49:15-23)  It was a technical customer service position that required the applicant pass a computer assessment before being offered employment and complete a six-week training after hire.  (*Id.*)

In addition to being tech savvy, CCRs must have strong verbal communication skills in order to provide Asurion's expected level of "world class customer service" to both deescalate the customer and simultaneously multitask and troubleshoot the customer's issue.  (30(b)(6) Dep. 34:15-35:13)  Consequently, Asurion required recent customer service experience for the CCR position.  (*Id.* at 32:16-19; Gillow Dep. 61:19-62:7 (explaining recent experience is necessary so that customer service is "second nature" to be able to calm the customer and troubleshoot the issue)  Asurion defined *recent* customer service experience as customer service experience within 1 to 2 years of the date of the application.  (*Id.* at 20:11-21:9)

All recruiters and recruiting coordinators who were involved in the hiring process were trained and instructed that the applicant's customer service experience must be recent.  (*Id.* at

---

[1] Asurion sold the facility to iQor in December 2016 and has not owned or operated the facility since that time. (30(b)(6) Dep. 11:22-24, 50:18-22)

20:17-20, 21:3-23; *see also* Ex. 6, Gillow Dep. 61:19-62:7, 63:11-65:4, 66:13-67:10, 68:3-14)

They were also instructed that those applying for the CCR position must have a high school

diploma or equivalent; strong verbal, listening, communication, time management, and multi-

tasking skills; and have advanced technical knowledge and skills. (Ex. 4, Resp. to Interrog. No.

16; *see also* Ex. 5, CCR Descriptions)

## III.     Asurion's Five-Step Hiring Process.

Asurion had a five-step hiring process for online applicants. (*See* Exhibit 7, Asurion's

Hiring Process; Ex. 3, 30(b)(6) Dep. 38:13-39:11, 99:17-100:13)

- *Step One*: the application is reviewed by the Recruiting Coordinator to determine whether the applicant should be phone screened. (*Id.*; *see also* Ex. 4, Resp. to Interrog. No. 7)

- *Step Two*: if selected, the applicant is phone screened by the Recruiting Coordinator to determine if he or she meets the basic minimum requirements for the position. *Id.*

- *Step Three*: if the applicant successfully completes the phone screen, he or she is scheduled for an in-person interview with the local recruiter. *Id.* Before the in-person interview, however, the applicant must pass a computer assessment. *Id.*

- *Step Four*: if the applicant successfully passes the computer assessment and in-person interview with the local recruiter, the applicant is interviewed by the site operations team (*i.e.* a supervisor). *Id.*

- *Step Five*: a hiring decision is made by the local recruiter. If the decision to hire is made, he or she must successfully pass a background check and drug screen. *Id.*

If the applicant successfully completes each step, the applicant is given a start date and must

complete a 6-week training. (Asurion's Resp. to Interrog. No. 2; 30(b)(6) Dep. 37:7-38:12)

## IV.     Asurion Hired Applicants with Recent Customer Service Experience and who Better Satisfied the Skills and Requirements for the CCR Position.

A.     *Gillow reviewed the online applications and conducted phone screens*.

Barbara Gillow was the Recruiting Coordinator for the Meridian call center in 2015.

Gillow has over eighteen years of experience in recruiting and has worked for Asurion since

2009.[2]  (Ex. 3, 30(b)(6) Dep. 23:25-24:2; Ex. 7, Gillow Dep. 157:12-25)  Gillow received

ongoing training on the requirements for the CCR position and on antidiscrimination.  (Gillow

Dep. 52:9-53:9, 102-104; 30(b)(6) Dep. 21:10-23, 24:3-18, 79:23-81:25)  She also received

training on recruiting.  (30(b)(6) Dep. 24:3-18; Gillow Dep. 158:1-17)

As Recruiting Coordinator, Gillow was responsible for performing Steps 1 and 2 of the

hiring process for online applicants.  (Ex. 3, 30(b)(6) Dep. 21:21-22:4)  Specifically, she

reviewed the applications and conducted phone screens to identify the applicants who

demonstrated the skills necessary to be successful in the CCR position.  (Gillow Dep. 44:14-

48:25, 152:15-153:7 (explaining what she is looking for during phone screens); 30(b)(6) Dep.

21:21-22:4)  Gillow did not make hiring decisions; she only decided whether the applicant

should proceed to Step 3.  (30(b)(6) Dep. 21:21-22:13; Gillow Dep. 75:1-9)  If so, she scheduled

the applicant for an in-person interview with the local recruiter.  (*Id.*; Gillow Dep. 69:16-21)

During the in-person interview, the applicant is evaluated on all requirements and skills

for the CCR position.  (Ex. 4, Asurion's Resp. to Interrog. No. 2; Ex. 3, 30(b)(6) Dep. 52:15-23)

Kathy Null, who was the Associate Recruiter in 2015, made the hiring decision after the

applicant passed the computer assessment and successfully completed the Step 3 and Step 4 in-

person interviews.  (*Id.*)  Even if a decision to hire is made, the applicant must pass a background

check and drug test (Step 5) before beginning employment.  (*Id.*)

B.      ***Lakisha Person was one of the 300 applicants who applied for a CCR position
        at the call center in April 2015***.

In April 2015, Asurion received over 300 applications for the CCR position.  (Asurion's

Resp. to Interrog. No. 5)  Because of the large volume of applicants, Gillow used an abbreviated

---

[2] Gillow worked as a Recruiting Coordinator for Rapid City South Dakota from 2009 to 2010; she worked as a
Recruiter at Asurion's Oregon call center from 2010 to August 2014; and she worked as Recruiting Coordinator for
the Meridian, Mississippi call center from 2014-2016.  (Gillow Dep. 25:20-28:19;  30(b)(6) Dep. 78:3-79:12)

phone script to screen applicants; she frequently screened applicants, including those whose application did not show recent customer service experience. (30(b)(6) Dep. 67:8-:68:1, 97:10-98:3; Gillow 70:12-23, 71:4-8, 164:8-12 (testifying it was "not uncommon" for her to screen applicants that did not show recent customer service experience)) During the phone screen, Gillow would review basic information about the CCR position, evaluate the applicant's verbal communication skills, confirm the applicant's work history, and determine whether the applicant had recent customer service experience. (Ex. 6, Gillow Dep. 152:15-153:7) Gillow would rely on the application and her conversation with the applicant to determine whether the applicant should proceed to Step 3 for the computer assessment and recruiter interview. (*Id.* at 62:8-25)

On April 7, 2015, Person submitted an online application for a CCR position at the call center. (Exhibit 8, Person Dep. 80:1-6; Ex. 9, Person App.; Ex. 6, Gillow Dep. 83:7-11; Ex. 3, 30(b)(6) Dep. 16:24-17:3) At the time of her application, Person had not worked in a customer service position in over eight years. (Ex. 9, Person Application) Person listed the following work history: (1) AbilityWorks Inc. where she packed notebooks into boxes and made labels from September 2014 through April 2015; (2) Suds Laundrymat where she washed, dried, and folded linen from 2007 to 2008; (3) Budget 8 where she worked in housekeeping cleaning rooms from October 2006 through May 2008; (4) Avery Dennison where she packed notebooks, paper, and folders into boxes and stacked boxes from November 2003 through March 2007; and (5) KFC where she worked as a cashier from April 2004 through November 2006. (*Id.*)

Person had no experience working in a technical or technology related customer service position like the CCR position, and she had no training or certifications in technology. (*See* Ex. 9; Ex. 8, Person Dep. 21:1-25:13 (testifying about educational background), 36:22-25, 46:12-16, 59:3-7, 127:8-17 (testifying that she has not performed a job similar to the CCR position);

Exhibit 16, EEOC's Resp. to Interrog. No. 4 (listing work history)) From 2001 until 2008, Person's experience consisted of working in housekeeping and laundry for at least seven hotels, in a production job at Avery Dennison, in a telemarketing job where she made cold calls to sell insurance to potential customers, and packing flower bulbs at Van Zyverden. (Ex. 8, Person Dep. 48:10-49:10, 54:7-19 (work at Avery), 69:7-23 (telemarketing position), 55:15-18 (work at Van Zyverden)) These were not customer service positions. (*Id.* at 58:2-5; *see also* Ex. 6, Gillow Dep. 93:19-94:5, 175:10-17)

In July 2008 Person was a in a car accident that left her paralyzed from the waist down. (Person Dep. 84:17-19) She did not work after the accident until she began at AbilityWorks in September 2014 in a production role. (*See* Ex. 9, Person Application; Person Dep. 60:9-11, 61:19-21, 62:25-63:3) Since 2008 she has received social security disability benefits from the Social Security Administration ("SSA") for a permanent disability. (*Id.* at 158:3-159:12)

C. ***Person's application did not proceed to Step 3 of the hiring process because she lacked recent customer service experience and did not demonstrate the communication skills necessary for the CCR position***.

On April 8, 2015, Gillow reviewed Person's application and decided to conduct a phone screen to determine whether Person had recent customer service experience. (Ex. 3, 30(b)(6) Dep. 67:8-68:1; Gillow Dep. 93:4-18, 164:2-7) Gillow entered a note on April 8, 2015 at 9:35 p.m. to "ck CS exp", meaning check customer service experience. (Exhibit 10, Person App. History Notes; Ex. 6, Gillow Dep. 85:7-88:86:4; Ex. 3, 30(b)(6) Dep. 69:17-70:7)

On April 10, 2015, Gillow conducted Person's phone screen. (Gillow Dep. 100:7-17; Person Dep. 88:13-18) Gillow used an abbreviated phone script for the call and wrote notes on the script. (Exhibit 11, Phone Script) The purpose of the call was to "listen and to engage the candidate." *Id.* During the call, Gillow confirmed information on Person's application,

explained the pay offered for the position, potential hours, the training course that was required, and confirmed Person's work history.  (*See id.*; Gillow Dep. 95:12-96:22; Person Dep. 91:2-23)  Person was not employed at the time of her application and did not have recent customer service experience.  (Gillow Dep. 96:6-10)

On April 11, 2015, Gillow entered a note at 2:17 a.m. that "PS complete; TBR - NRF, LCS (recent)."  (Ex. 10, Notes, at Asurion 0011)  This meant that the phone screen was complete and Person was "to be rejected" because she lacked recent customer service experience and was not the right fit for the position.  (Gillow Dep. 86:5-19; 30(b)(6) Dep. 68:16-24)  On April 13, 2015, Gillow sent Person a letter explaining that Asurion had "decided to pursue other candidates that better meet the required skills and qualifications."  (Exhibit 12, Rejection Letter; Ex. 10, Notes, at Asurion 0011; Gillow Dep. 87)  Gillow did not know about Person's alleged disability, and it was not a factor or consideration in the decision.  (30(b)(6) Dep. 104:1-13; Gillow Dep. 97:25-98:21 (testifying that she was "completely shocked" when the allegations came up because she "had no idea" that Person was in a wheelchair as "that's something that I know I would have remembered.  It's something out of the ordinary."))

V.      **Allegations of Discrimination.**

Person filed a Charge of Discrimination on August 21, 2015 claiming she had been discriminated against because of her disability and was regarded as disabled in violation of the American With Disabilities Act of 1990.  (Exhibit 13, Charge of Discrimination)  She claims she met the requirements for the CCR position and was not hired at the Meridian call center after she informed Ms. Null during a phone call that she had a disability that required that she use a wheelchair.  *Id.*  During her deposition, Person admitted that she did not speak with Ms. Null who, as the Associate Recruiter in Meridian, was responsible for making hiring decisions.  (Ex.

8, Person Dep. 89:22-24, 138:2-10; *see also* Ex. 3, 30(b)(6) Dep. 52:24-53:2)  She only spoke with Gillow during the phone screen.  (Person Dep. 89:13-15 (call lasted about 15 minutes))[3]  But Gillow did not make hiring decisions.  (Ex. 6, Gillow Dep. 152:10-14)

The EEOC filed this lawsuit on May 4, 2017 alleging that Asurion failed to hire Person because of her disability in violation of the ADA.  (Exhibit 14, Compl.)  The EEOC claims that none of the applicants hired were disabled, none required an accommodation, and some were less qualified than Person.  (*Id.* at ¶ 24)  The EEOC seeks back pay, front pay or hire, prejudgment interest, and past and future pecuniary losses including medical expenses and job search expenses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and humiliation.  (*Id.* at Prayer for Relief ¶¶ C-E, G)  The EEOC also seeks punitive damages for Asurion's alleged "malicious and reckless conduct."  (*Id.* at Prayer for Relief ¶ F)  Asurion denies these allegations and denies the EEOC is entitled to any relief.  (Exhibit 15, Asurion's Answer)

Disability played no role in any decision relating to Person's application, and there is absolutely no evidence to support such a finding or a punitive damage claim.  (30(b)(6) Dep. 104:1-13; Gillow Dep. 167:10-168:7)  Person even testified that she has no evidence to support her claim that she was not hired because she uses a wheelchair:

> Q: Did anyone at Asurion tell you that you were not hired because you were in a wheelchair?
>
> A. No, ma'am.
>
> Q. Did you receive any document from Asurion that stated you were not hired because you were in a wheelchair?
>
> A. No, I haven't.

---

[3] Person claims she told Gillow that she was paralyzed and used a wheelchair during her phone-screen.  (Person Dep. 93:16-95:17)  Gillow denies these claims.  (Gillow Dep. 97:25-98:21)  This is not a *genuine* issue of *material* fact because it is <u>not</u> disputed that Person did not have recent customer service experience and that Asurion determined she did not demonstrate the skills necessary for the CCR position.  The applicants hired had recent customer service experience and better demonstrated the necessary skills.  (Ex. 4, Asurion's Resp. to Interrog. No. 5)

Q. Do you have any evidence to support your claim that you were not hired because you were in a wheelchair?

A. No.

Q. And you just believe this is the reason?

Mr. Fischer: Object to form.

Q. Correct?

A. Yes. Correct.

(Person Dep. 127:18-128:8) Indeed, Asurion employed people who used wheelchairs in 2015. (Asurion Resp. to Interrog. No. 17; 30(b)(6) Dep. 39:12-20) Under such circumstances, summary judgment in favor of Asurion is proper and should be granted in its entirety.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when, viewing the evidence most favorably to the nonmoving party, the record evidence including depositions, documents, discovery responses, or other material show there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) & (c). Summary judgment is not disfavored but looked upon as an important process where the parties can obtain a "just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Once the moving party's initial burden of showing the absence of material fact is satisfied, the burden shifts to the nonmoving party. *Id.* The nonmoving party must then produce specific and "significant probative evidence" showing there is a genuine issue of material fact for trial. *Id.*

Summary judgment should be granted where a plaintiff "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden." *Celotex*, 477 U.S. at 322. Mere unsubstantiated or conclusory allegations are not sufficient to withstand summary judgment or to create a fact issue. *Little*, 37 F.3d at 1075; *Massey v. Tingle*, 867 So. 2d

235 (Miss. 2004).  Denials that are not supported by the record are insufficient to withstand summary judgment and to create a fact issue.  *Id.*  The existence of a mere scintilla of evidence in support of the non-movant's position is also insufficient.  *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  There must be sufficient evidence on which the jury could reasonably find for the non-movant.  *Id.*  There is no such evidence in this case.

## ARGUMENT

I.      **The EEOC's Disability Discrimination Claim Fails as a Matter of Law.**

A.      *Governing Law*.

The ADA makes it unlawful for an employer to discriminate against a "qualified individual on the basis of disability."  42 U.S.C. § 12112(a) (2009).  A plaintiff may establish a claim of disability discrimination under the ADA by presenting either direct evidence of discrimination or by presenting indirect evidence of discrimination pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).  There is no direct evidence of discrimination.  (*See* Person Dep. 127:18-128:3)  Thus, the burden shifting framework in *McDonnell Douglas* applies.

The EEOC has the initial burden of proving a prima facie case of failure-to-hire discrimination by demonstrating: (1) Person suffers from a disability; (2) Person is qualified for the CCR position; (3) Person was subject to an adverse employment action; and (4) Person was replaced by a nondisabled applicant or was treated less favorably than a nondisabled applicant. *Daigle*, 70 F.3d at 396; *see also O'Quinn v. Hallmark Toyota-BMW, Inc.*, No. 3:06CV00192-DPJ-JCS, 2008 WL 11380130, at *4 (S.D. Miss. Feb. 7, 2008) (*citing McDonnell Douglas*, 411 U.S. 792).  If the EEOC establishes a prima facie case, the burden shifts to Asurion to articulate a legitimate, non-discriminatory reason for its action. *Tex. Dep't of Community Affairs v. Burdine*,

450 U.S. 248, 253 (1981). This is a burden of production of evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). Once Asurion satisfies this production burden, the EEOC may then offer evidence of pretext, *i.e.* that the non-discriminatory reasons are false. *McDonnell Douglas*, 411 U.S. at 802.

At all times, the EEOC has the ultimate burden of proving intentional discrimination. *St. Mary's Honor Center*, 509 U.S. at 511. The EEOC must prove by a preponderance of the evidence that the defendant's intent was to discriminate against Person because of her disability. *Id.* The EEOC has not satisfied its burden.

      B.     ***The EEOC cannot establish a prima facie case of discrimination***.

Even assuming the EEOC is able to establish the first and third elements,[4] the EEOC is unable to establish a prima facie case because Person was not qualified for the CCR position, was not replaced by a nondisabled applicant, and was not treated less favorably than a nondisabled applicant. Moreover, Person is estopped from arguing that she is a qualified individual with a disability because she receives social security disability benefits.

      1.     <u>Person was not qualified for the CCR position</u>.

"The determination of whether an individual is qualified for purposes of the ADA is a two-step process, and should be made as of the time of the employment decision." *Browning v.*

---

[4] "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, that deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Whether an action is sufficient to constitute an adverse employment action "must be determined on a case-by-case basis, using both a subjective and an objective standard." *Id.* (retaliation claim but reasoning is instructive). Here, the alleged adverse action is the decision that Person should not proceed to Step 3 of the hiring process. This is arguably distinct from a failure-to-hire claim. Indeed, Gillow did not make any hiring decisions. And it cannot be ignored that even if Person had advanced to Step 3, she would have had to pass a computer assessment, successfully complete two in-person interviews, pass a background check, and pass a drug test before a decision to hire was made. *Cf. Burger v. Central Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999) ("Title VII was only designed to address 'ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'")

*Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1047 (8th Cir. 1999).  First, the court considers whether "the individual possesses the requisite skills, education, certification or experience necessary for the job."  *Id.* at 1047 (citing 29 C.F.R. § 1630.2(m)).  Second, the court considers "whether the individual can, despite her impairments, perform the essential functions of the job either with or without reasonable accommodation."  *Id.* at 1048.

a)   *Person did not demonstrate the requisite skills or have the experience necessary for the CCR position.*

The descriptions for the CCR position listed, among other things, one plus years of customer service experience and strong verbal and written communication skills as requirements. (Ex. 5)  While Asurion allows some flexibility on the length of the applicant's customer service experience, (Ex. 3, 30(b)(6) Dep. 91:5-14, 101:17-102:17, 107:1-24), Asurion requires *recent* customer service experience, which is experience within two years of the date of the application. (*Id.*, 101:3-16)  Asurion also requires strong verbal communication skills because callers had escalated technical issues and "were not calling because they were happy."  (*Id.*, 107:11-12) CCRs must "use appropriate grammar and tone to provide information and problem resolution to customers" all while providing service that keeps the customer calm.  (Ex. 5; Ex. 6, Gillow Dep. 61:19-62:7 (explaining customer must be "second nature" to be able to calm the customer and troubleshoot the issue)  Person did not demonstrate these skills.  (30(b)(6) Dep. 104:14-25)

Person also did not have *recent* customer service experience when she applied for the CCR position in April 2015.  At that time, the customer service position she identified was in 2006 when she worked as a cashier at KFC.  (Ex. 9, Person App.)  This was over eight years before she applied for the CCR position.  It *was not* recent customer service experience. Additionally, based on Gillow's over eighteen years' experience in recruiting and knowledge of what it takes to be successful in the CCR position, Gillow determined that Person did not have

the recent customer service experience or demonstrate the verbal communication skills, including grammar, enunciation, and tone, necessary to be successful in the CCR position. (Gillow Dep. 164:16-23, 180:6-181:6; 30(b)(6) Dep. 20:6-10, 104:19-25)

b) *Person could not perform the essential functions with or without a reasonable accommodation.*

Person did not research the requirements for the CCR position. (Person Dep. 78:17-79:2) She believed it was a "good job" for her because she "like(s) to deal with people" and "it was a job being on the phone and a job sitting at a desk [and she was] already bound to a wheelchair to be able to sit at a desk." (Ex. 8, Person Dep. 78:6-11) Despite Person's contentions, the position was not simply an entry level position sitting at a desk; it was a technical customer service position. CCRs must be tech savvy,[5] have active listening skills to understand and troubleshoot issues, use appropriate grammar and tone, and be able to provide technical support for programming and/or equipment issues. (*See* Ex. 5, CCR Descriptions) Essential functions of the position generally include: answering customer calls, identifying customer issues, providing step-by-step instruction to customers to troubleshoot and resolve technical issues, answering customer questions, offering products to the customer, defusing customer frustrations, resolving customer issues, and providing world class customer service. (Ex. 4, Resp. to Interrog. No. 16)

The EEOC must prove that Person could perform the essential functions of the position with or without an accommodation. Person admittedly *did not* request an accommodation after applying for the CCR position. (Ex. 8, Person Dep. 97:20-22 ("Q. When you were on the call with Ms. Gillow, did you ask for an accommodation? A. No")) Therefore, Asurion had no obligation to consider any accommodation. *Cf. Crawford v. U.S. Dep't of Homeland Sec.*, 245 F. App'x 369, 381 (5th Cir. 2007) (affirming grant of summary judgment partly because there was

---

[5] Applicants must pass a computer assessment and be able to navigate computers, and if hired, complete a six-week training course. (Ex. 4, Asurion's Resp. to Interrog. No. 16, 2)

no evidence the plaintiff requested an accommodation meaning the employer was under no obligation to accommodate any disability); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 314 (5th Cir. 1997) (concluding case improperly tried because employee failed to request accommodation). Moreover, there is no evidence that Person could perform the essential functions without an accommodation.[6] At the time of her application, Person had not performed a job that was similar to the CCR position. (Person Dep. 127:8-17) Her experience was working in housekeeping, laundry, and production roles. (*See* Ex. 9) She did not have work experience that would otherwise qualify her for the CCR position, and she had no training or education in a technical position. *Cf. O'Quinn*, 2008 WL 11380130, at *3 (finding plaintiff not qualified where he had not held a position similar to the position he applied for, had no managerial training or experience, and did not know the requirements for the position).[7]

2.     Person was not treated less favorably than a nondisabled applicant.

The EEOC claims that no nondisabled applicants were hired. (Ex. 15, Compl. at ¶ 24) The EEOC's claim is factually unsupported. Over 300 people applied for a CCR position in April 2015; Asurion hired 64 of the applicants. (Ex. 4, Resp. to Interrog. Nos. 2, 5) There is absolutely no record evidence that none were disabled or required an accommodation. The evidence does demonstrate, however, that in 2015 Asurion employed people at the call center who used wheelchairs. (Resp. to Interrog. No. 17 & 18) The record is also undisputed that local recruiters do not know whether an applicant has a disability when making hiring decisions; they cannot access this information even if the applicant self-reported. (*Id.*; *see also* 30(b)(6) Dep.

---

[6] *Cf. Estate of Clarence Sims v. City of Aberdeen*, 2011 WL 132362, *2 (N.D. Miss. Jan. 14, 2011) (concluding ADA claim failed where there was no "specific evidence" presented to the court concerning the plaintiff's disability and the evidence that was before the court showed plaintiff was not substantially limited in a major life activity).
[7] Person testified that in July 2015 she could not stretch out her hand such that her sister had to complete her EEOC questionnaire form for her. (Person Dep. 137:2-5) This testimony also demonstrates she was not qualified because CCRs used computers, which necessarily includes use of both hands, to perform essential functions.

48:3-17, 104:1-13) Gillow did not have this information deciding whether to advance an applicant to Step 3. (Gillow Dep. 88:7-20) The EEOC simply cannot establish that no hires were disabled or required an accommodation.

In addition, no nondisabled applicant was treated more favorably than Person under "nearly identical circumstances." The Fifth Circuit has explained that to establish this fourth element, a plaintiff "is required to show ... that his 'conduct that drew the adverse employment decision [was] nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions.'" *Moghalu v. Bd. of Supervisors for the Univ. of Louisiana Sys. for Nw.*, 643 F. App'x 326, 331 (5th Cir. 2016) (quoting *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015)); *see also O'Quinn*, 2008 WL 11380130, *4 (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) ("To demonstrate that another employee outside the protected class, but treated more favorably, is 'similarly situated,' a plaintiff must show that the supposed misconduct of both employees was 'nearly identical.' ")). Person's last customer service position was over eight years before her application, and her experience includes working in housekeeping, laundry, or production jobs. Person has not identified an applicant who had a nearly identical employment history and experience, did not have a disability, and was treated more favorably. To the contrary, Person testified that she does not know anything about any other applicant's qualifications. (Ex. 8, Person Dep. 173:10-22) Person simply was not treated less favorably than a nondisabled applicant.[8] *Abarca v. Metropolitan Transit Authority*, 404 F.3d 938, 941 (5th Cir. 2005) (finding plaintiff failed to establish a prima facie case where he failed to identify any employee with whom he was similarly situated but was treated more favorably, *e.g.* that he was required to do some act that others similarly situated were not required to do).

---

[8] It should be noted that as a courtesy Gillow conducted a phone screen for most applicants even if their application, like Person, did not demonstrate the necessary experience. (Gillow Dep. 54:9-21; 30(b)(6) Dep. 67:8-68:1, 168:12-169:12) No applicant was treated more favorably even during the screening process. (Gillow Dep. 174:21-24)

3.      The EEOC and Person are judicially estopped from claiming Person is a qualified individual with a disability.

The doctrine of judicial estoppel prevents a party from asserting in a legal proceeding a position that is contrary to a position taken in another proceeding. *Ergo Science, Inc. v.. Martin*, 73 F.3d 595, 598 (5th Cir. 1996).  "The doctrine is not limited to proceedings before courts of law; it also extends to quasi-judicial administrative proceedings, including the application process for social security benefits." *Graf v. Wal-Mart Stores, Inc.*, 4 F. Supp. 2d 680, 682 (S.D. Tex. 1998) (citing *Muellner v. Mars, Inc.*, 714 F.Supp. 351, 358 (N.D. Ill. 1989); *see also Harris v. Marathon Oil Co.*, 948 F. Supp. 27, 28 (W.D. Tex. 1996), *aff'd*, 108 F.3d 332 (5th Cir. 1997)).

In *Cleveland*, the United States Supreme Court addressed whether a plaintiff who claims to be both "totally disabled" for purposes of receiving disability benefits and "qualified" for employment under the ADA is judicially estopped from bringing an ADA claim.  *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999).  The Court concluded that to survive summary judgment in favor of the employer, the plaintiff must address the inconsistency between claiming she is qualified for the position under the ADA and is also totally disabled such that she is entitled to disability benefits.  *Id.* at 798, 806 ("ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim").  A plaintiff's explanation of the apparent inconsistency must be "sufficient to warrant a reasonable juror[] concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 463 (5th Cir. 2005) (quoting *Cleveland*, 526 U.S. at 807).  If a plaintiff fails to explain the inconsistency between her qualification and disability, or if the explanation is insufficient, then her ADA claim is judicially estopped by her earlier statements regarding disability.  *Id.*

In *Graf*, the plaintiff admitted she had received social security benefits for years based on representations that she is totally and permanently disabled. *Graf*, 4 F. Supp. 2d at 682. The district court found the receipt of such benefits and the representations made to the SSA barred her from asserting she was a "qualified individual with a disability" under the ADA. *Id.* Similarly, in *Reed*, the Fifth Circuit found the plaintiff was judicially estopped because she made specific factual statements to the SSA that were inconsistent with her claim that she was qualified for the position with or without an accommodation. *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477 (5th Cir. 2000). Here, Person testified that she has received social security disability benefits since July 2008 and that her disability is permanent. (Person Dep. 158:3-159:12) She represented to the SSA that she is totally disabled in order to have received benefits for the last ten years. Indeed, she did not work for any employer from July 2008 until 2014. This is inconsistent with the EEOC's position that Person was qualified for the CCR position when she applied in 2015. The EEOC is judicially estopped from bringing its ADA claim.

C.    ***Asurion had legitimate, nondiscriminatory reasons for its decision that Person should not proceed to Step 3 of the five-step hiring process***.

Assuming that the EEOC is able to establish a prima facie case of disability discrimination, which is denied for the above reasons, the burden shifts to Asurion to articulate a "legitimate, non-discriminatory reason for the adverse employment action." *Burdine*, 450 U.S. at 253. This is a burden of production, not persuasion. Asurion had legitimate, nondiscriminatory reasons for its decision.

First, Asurion decided that Person should not proceed to Step 3 because she did not satisfy key requirements for the CCR position. She lacked recent customer service experience, and Gillow determined she was not the right fit for the CCR position. (Ex. 10, Notes; Ex. 3, 30(b)(6) Dep. 68:16-24) Days before conducting Person's phone screen, Gillow noted that the

reason for the phone screen was to determine whether Person had recent customer service experience. (Ex. 10, at Asurion 11) Person did not have recent customer service experience. Based on Gillow's over eighteen years' experience in recruiting and knowledge of what it takes to be successful in the CCR position, Gillow determined that Person did not demonstrate the verbal communication skills, including grammar, enunciation, and tone, necessary to be successful in the CCR position. (Gillow Dep. 164:16-23, 180:6-181:6 (describing issues with tone))

Second, even assuming Person was qualified (which is denied), there were hundreds of other qualified applicants that Asurion determined would be successful in the position. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033-34 (8th Cir. 2012) (the availability of more qualified candidates was a legitimate nondiscriminatory reason for refusal to promote plaintiff). As the D.C. Circuit has explained, the court must "respect the employer's unfettered discretion to choose among qualified candidates." *Adeyemi v. D.C.*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). To conclude otherwise "would be to render the judiciary a super-personnel department that reexamines an entity's business decisions—a role [courts] have repeatedly disclaimed." *Id.* (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007)).

Third, Asurion chose to hire the 64 applicants it concluded were better qualified out of the over 300 applicants. (Ex. 4, Resp. to Interrog. No. 5) It is entirely proper for Asurion to pursue and hire the better qualified applicants it believed would be successful in the CCR position. "In the failure-to-hire context, a desire to hire the more experienced or better qualified applicant is a non-discriminatory, legitimate, and common reason on which to base a hiring decision." *Stone v. City of Indianapolis Pub. Utilities Div.*, 28 F. App'x 573, 577 (7th Cir. 2002) (citations omitted). In sum, Asurion had legitimate reasons for its decision.

D.     *The EEOC cannot establish pretext*.

Since Asurion has satisfied its burden of production, the burden returns to the EEOC to prove that the legitimate non-discriminatory reasons are pretext for discrimination. The EEOC must show both that Asurion's reasons for its decision are false[9] and that prohibited discrimination was the real reason for its decision. *Harris v. Rock Tenn CP, LLC*, No. 1:12CV189-DAS, 2014 WL 547079, at *7 (N.D. Miss. Feb. 10, 2014) (citation omitted). The evidence of pretext must be more substantial than pure speculation; the EEOC must provide sufficiently specific reasons for its allegations of pretext. *See Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 42 (5th Cir. 1996).

The EEOC claims that Person was not hired because she is paralyzed from the waist down and uses a wheelchair. (*See* Compl.; Person Dep. 138:20-25) However, the undisputed record evidence demonstrates that Asurion hired employees at the Meridian call center who used a wheelchair. (Asurion's Resp. to Interrog. No. 17 & 18) Person even knew Asurion employed people in a wheelchair. (Person Dep. 74:1-75:11 & 76:9-11 (testifying she was told before applying that Asurion had employees in wheelchairs), 108:13-109:6 (testifying she was told after applying that Asurion currently had employees who used wheelchairs))

The EEOC also claims that Person was more qualified than other applicants who were hired as CCRs. (Compl. at ¶ 24) "[A] 'fact finder can infer pretext if it finds that the employee was clearly better qualified (as opposed to merely better or as qualified) than the employees who are selected.'" *Churchill v. Texas Dep't of Criminal Justice*, 539 F. App'x 315, 318 (5th Cir. 2013) (quoting *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995)). The EEOC "must present evidence . . . that 'no reasonable person, in the exercise of impartial

---

[9] "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578.

judgment, could have chosen the candidate selected over [Person] for the job in question.'" *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010). "[U]nless the qualifications are so widely disparate that no reasonable employer would have made the same decision, any differences in qualifications are generally not probative evidence of discrimination." *Id.* "Thus, the bar is set high for this kind of evidence." *Id.* Given Person's work history and lack of experience in a position similar to the CCR position, she was not so "clearly better qualified" such that no reasonable employer would have made the same decision. *Churchill*, 539 F. App'x at 322 ("Demonstrating that one is 'clearly better qualified' is understandably very difficult to meet so as to avoid judicial second-guessing of business decisions....").

There is no evidence of intentional discrimination or pretext in this case.

## II.     The EEOC's Punitive Damage Claim Fails as Matter of Law.

The EEOC seeks punitive damages for Asurion's alleged "malicious and reckless conduct" of failing to hire Person as a CCR. (*See generally* Compl.) A plaintiff may recover punitive damages if the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The availability of punitive damages turns on the defendant's state of mind, not the nature of the defendant's conduct. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). The employer "must at least discriminate in the face of a perceived risk that its actions will violate" the discrimination statute. *Id.* at 536. The plaintiff must also show that the "malfeasing agent served in a 'managerial capacity' and committed the wrong while 'acting in the scope of employment.' " *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 405 (5th Cir. 2000).

The punitive damage claims fails because Gillow was not a management level employee, and she did not make hiring decisions (or have authority to make hiring decisions). *See id.* The

claim also fails because Asurion has an EEO and accommodation policy, and Gillow was trained on these policies. Asurion acted in good faith to comply with the ADA. *Id.* Additionally, Gillow testified that she was not aware that Person was paralyzed and used a wheelchair at the time she made the decision that Person should not proceed to Step 3 and was completely shocked to learn about the allegations in this case. (Gillow Dep. 97:25-98:21) Gillow also testified that such information would not have impacted, been a consideration, or otherwise changed her decision. (Gillow Dep. 177:7-178:9) Indeed, Asurion employed people at the call center who used wheelchairs. Person simply did not meet the requirements for the position and did not demonstrate the skills Asurion determined were necessary to be successful as a CCR. There is absolutely no evidence of malicious and reckless conduct that would support an award of punitive damages in this case. The punitive damage claim should be dismissed.

## CONCLUSION

The EEOC's disability discrimination claim fails as a matter of law. The undisputed record evidence demonstrates that Person was not qualified for the CCR position, was not treated less favorably than a nondisabled applicant, and is estopped from claiming that she is a qualified individual with a disability because she receives social security disability benefits. Even assuming the EEOC can establish a prima facie case of discrimination, Asurion had legitimate, nondiscriminatory reasons for its decision that Person should not proceed to Step 3 of the hiring process and appropriately pursued the better qualified applicants. Finally, the EEOC cannot establish pretext. Person's subjective belief that she was not hired because she is a wheelchair because "what the other reason would be?" is simply insufficient to defeat summary judgment. (Person Dep. 125:13-126:10) Asurion's Motion for Summary Judgment should be granted. The EEOC's Complaint should be dismissed in its entirety, with prejudice.

This the 16th day of July, 2018.

Respectfully submitted,

ASURION, LLC

By Its Attorneys,

BAKER, DONELSON, BEARMAN,
 CALDWELL & BERKOWITZ, PC


By: */s/Nakimuli Davis-Primer*
 NAKIMULI DAVIS-PRIMER


Nakimuli Davis-Primer (MB No. 103320)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
MAILING:  Post Office Box 14167
Jackson, Mississippi  39236-4167
PHYSICAL:  One Eastover Center
100 Vision Drive, Suite 400
Jackson, Mississippi  39211
Telephone:  (601) 351-2400
Facsimile:  (601) 351-2424
ndavis@bakerdonelson.com


## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing *Memorandum in Support of Motion for Summary Judgment* with the Clerk of the Court using the ECF system which sent notification of such filing to counsel of record.

This 16th day of July, 2018.

*/s/ Nakimuli Davis-Primer*
NAKIMULI DAVIS-PRIMER